1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Andrew Levine, Esq. (SBN: 278246)
       levine@braunhagey.com
3  Ronald J. Fisher, Esq. (SBN: 298660)
       fisher@braunhagey.com
4  Sarah Salomon, Esq. (SBN: 308770)
       salomon@braunhagey.com
5  Hunter B. Thomson, Esq. (SBN: 330533)
       thomson@braunhagey.com
6  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
7  San Francisco, CA 94104
   Telephone: (415) 599-0210
8  Facsimile: (415) 599-0210

9  Attorneys for Plaintiff
   WSJ, LLC d/b/a SEISMIC BREWING CO.

10

11

12                  **UNITED STATES DISTRICT COURT**

13                 **NORTHERN DISTRICT OF CALIFORNIA**

14

15
     WSJ, LLC d/b/a SEISMIC BREWING          Case No. _____
16   COMPANY,
                                             **ANTITRUST**
17              Plaintiff,
                                             **COMPLAINT BY WSJ, LLC d/b/a**
18        v.                                 **SEISMIC BREWING COMPANY FOR:**

19   DBI BEVERAGE INC.; DBI BEVERAGE
     NAPA; DBI BEVERAGE SACRAMENTO;          **1. VIOLATIONS OF THE CLAYTON ACT**
20   DBI BEVERAGE SAN FRANCISCO; DBI            **(15 U.S.C. § 18.)**
     BEVERAGE SAN JOAQUIN; DBI
21   BEVERAGE SAN JOSE; REYES                **2. VIOLATIONS OF THE SHERMAN ACT**
     HOLDINGS, LLC; and HARBOR                 **(15 U.S.C. § 2)**
22   DISTRIBUTING LLC,
                                             **3. VIOLATIONS OF CALIFORNIA'S**
23              Defendants.                     **UNFAIR COMPETITION LAW**
                                                **(Bus. & Prof. Code § 17200 et seq.)**
24

25                                           **JURY TRIAL DEMANDED**

26                                           ┌─────────────────────┐
                                             │      REDACTED        │
27                                           └─────────────────────┘

28

**INTRODUCTION**

1.     Seismic is a small, family-owned craft brewer dedicated to producing delicious, sustainable beer from its epicenter in Sonoma County. Seismic brings this complaint for violations of federal antitrust laws against the largest distributor in the United States, Reyes, and Seismic's former distributor, DBI, which conspired with Reyes to aid its monopolization of the beer distribution market and to harm Seismic's ability to distribute its products to consumers.

2.     Craft beer originated in California, and California remains a key driver of growth in the industry. California is home to over 1,000 craft breweries, which is more craft breweries than any other state. In 2018, craft brewers in California supported over 61,000 people in full-time jobs, paid over $905 million in state and local taxes, and contributed over $9 billion to California's economy.[1] They also made great beer.

3.     In light of the antitrust violations discussed below, California's once robust craft beer industry is now in jeopardy. As a recent report issued by the U.S. Treasury on competition issues in the alcohol industry recognized, "[d]istributors compete on factors such as logistical capabilities, execution, marketing services, and financial terms to win and (franchise laws aside) retain the business of suppliers with desirable brands."[2] Beginning no later than 2018, Defendant Reyes began rapidly acquiring beer distributors and expanding its market share to dominate beer distribution in California. As a result, competition in the beer distribution has decreased, leading to craft breweries and retailers being coerced into contracts with materially less favorable service commitments.

4.     On September 13, 2019, Defendant DBI was acquired by Reyes. DBI conspired with Reyes to monopolize the California beer distribution market and unlawfully concentrate Reyes' power for the purposes of destroying fair competition. In furtherance of the conspiracy, DBI agreed as part of Reyes' acquisition to force Seismic and other craft brewers to "negotiate" new,

---

[1] California Craft Brewers Association, *California Craft Beer 2018 Economic Impact* (Oct. 2019), *available at* https://californiacraftbeer.com/wp-content/uploads/2019/12/CCBS_economicImpact19_85x11F.pdf.
[2] *See* U.S. Treasury Report, *Competition in the Markets for Beer, Wine, and Spirits*, (Feb. 2022) at 23-24 (hereafter, the "Federal Alcohol Competition Report"), *available at* https://home.treasury.gov/system/files/136/Competition-Report.pdf?msclkid=cf70c97cb9e611eca58cf50abf0621fa.

anticompetitive distribution agreements that make it virtually impossible to switch distributors upon the purported sham assignments of Seismic's and these brewers' distribution rights.[3]

5.     For example, Defendant Reyes attempted to force Seismic to abandon the contracts it had negotiated at arm's length with DBI and Elyxir Distributing LLC (which included favorable termination terms for Seismic), and instead demanded that Seismic agree to an onerous form contract that would have made it virtually impossible for Seismic to switch to a competing distributor. When Seismic refused, DBI and Elyxir began pressuring Seismic to abandon its contractual rights and submit to Reyes' contract at Reyes' behest and direction. They also conspired to retaliate against Seismic and others who did not fall in line with their anticompetitive plans. For example, after Seismic refused to accede to DBI's collusion, Reyes placed "bounties" that targeted Seismic's points of distribution in a retaliatory manner. Upon information and belief, bounties were arranged to incentivize DBI's and Reyes' salespeople to cause Seismic to lose permanent "tap handle" placements at its important retail accounts. Similar attacks targeted other craft brewers that rejected DBI's sham assignments.

6.     Aftershocks from DBI's and Reyes' anticompetitive conduct have damaged competition and caused substantial injuries that the antitrust laws are intended to remedy. As a result, Seismic has encountered massive bottlenecks, increased costs, and lost sales revenue trying to get its product to market in the territories formerly covered by DBI and co-conspirator Elyxir. Seismic has also incurred costs scrambling to replace the bespoke distribution agreements it had negotiated—often on less favorable terms than those it had negotiated at arm's length prior to Reyes' unlawful concentration of the market. Moreover, this highly concentrated market no longer allows craft brewers to access a distributor, other than Reyes, that can offer a comparable scope to the territories DBI covered.

7.     In San Francisco, for example, Seismic could not find a replacement distributor for months. Its sales cratered. The city, which is a bellwether of success or failure, became Seismic's

---

[3] Co-conspirator Elyxir Distributing LLC's participation in the conspiracy followed the same pattern, except that until Reyes acquired Elyxir, they were direct competitors in Monterey County. In or about June 2020, Elyxir joined the conspiracy and likewise foisted a purported sham assignment of Seismic's distribution rights (in reality, a wholly new contract with a monopolistic distribution network) and threatened to punish Seismic for standing on its rights under the distribution agreement.

Case No. _____

worst-performing area. Seismic resorted to direct sales and self-distribution there until it was finally able to sign on with a new distributor for that territory. Seismic was left with no choice but to accept a worse distribution agreement and was unable to bargain for many of the key protections that DBI had agreed to in the parties' distribution agreements.

8.      Seismic therefore brings this Complaint against DBI and Reyes for violations of the Clayton Act and Sherman Act. Seismic requests injunctive relief to restore a competitive market, including an order requiring Reyes to divest itself of its numerous unlawful and anticompetitive acquisitions (including of DBI and co-conspirator Elyxir). Seismic also seeks to recover the millions of dollars in damages it has incurred as a result of Reyes', DBI's, and Reyes' co-conspirator Elyxir's anticompetitive efforts to use Reyes' monopoly power to force Seismic to consent to an abusively unfavorable and anticompetitive contract.

## JURISDICTION AND VENUE

9.      The Court has federal question jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331 because they arise under the federal antitrust laws, and supplemental jurisdiction over Seismic's claim under California's Unfair Competition Law pursuant to 28 U.S.C. § 1367.

10.     The Court has personal jurisdiction over Defendants because they directed their tortious conduct at persons and activities within the State of California, and these claims arose in California.

11.     The Court further has jurisdiction over Defendants because they have offices and transact business in the State of California and because they have consented to this jurisdiction.

12.     The Court further has jurisdiction over the DBI Defendants because their principal place of business is in California and they are registered here.

13.     The Court further has jurisdiction over Defendant Harbor because its principal place of business is in California and it is registered here.

14.     The Court further has jurisdiction over Defendant Reyes because Harbor is its wholly-owned subsidiary, as described further below.

15.     Venue in this District is proper pursuant to 15 U.S.C. § 22 because Defendants transacted business in this District. Venue in this District is further proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

**PARTIES**

**A.     Plaintiff WSJ, LLC d/b/a Seismic Brewing Company**

16.     Plaintiff Seismic Brewing Company, a/k/a WSJ, LLC, is a Sonoma County craft brewery, headquartered in Santa Rosa, California, and registered as a limited liability company under the laws of the State of Delaware.

**B.     The DBI Defendants**

17.     Defendant DBI Beverage Inc. ("DBI Beverage") is a Tennessee corporation that, upon information and belief, serves as the parent holding company, operator, manager, owner, and corporate decision maker for numerous subsidiary "DBI" beer distributors located around the country and in Northern California in particular. DBI Beverage is headquartered, upon information and belief, at 2 Ingram Boulevard, La Vergne, Tennessee.

18.     In Northern California, DBI Beverage operated five wholly-owned subsidiaries, also named as Defendants, that distributed Seismic's beer: DBI Beverage Napa, DBI Beverage Sacramento, DBI Beverage San Francisco, DBI Beverage San Joaquin, and DBI Beverage San Jose (collectively, "DBI's Northern California subsidiaries").

19.     Upon information and belief, DBI's Northern California subsidiaries are mere conduits and instrumentalities of their parent, DBI, who dominates and controls them. There exists such a unity of interest and ownership that the individuality or separateness of DBI's Northern California subsidiaries cannot be recognized, because to do so would promote injustice.

20.     Defendant DBI Beverage Napa ("DBI Napa") is a California corporation with its principal place of business at 2449 Watney Way, Fairfield, California. DBI Napa is a wholly-owned subsidiary of DBI Beverage. Until the sale of substantially all of its assets to Reyes on or about September 13, 2019, DBI Napa was engaged in the business of beer and beverage products distribution in the counties of Napa, Solano, Lake, and Mendocino through distribution branches

1    located in the cities of Fairfield and Ukiah. Until events giving rise to this complaint, DBI Napa

2    distributed beer manufactured by Seismic.

3         21.    Defendant DBI Beverage Sacramento ("DBI Sacramento") is a California

4    corporation with its principal place of business at 3500 Carlin Drive, West Sacramento, California.

5    DBI Sacramento is a wholly-owned subsidiary of DBI Beverage. Until the sale of substantially all

6    of its assets to Reyes on or about September 13, 2019, DBI Sacramento was engaged in the

7    business of beer and beverage products distribution in all or parts of the counties of Alpine, Butte,

8    Colusa, El Dorado, Nevada, Placer, Plumas, Sacramento, Sierra, Sutter, Yolo, and Yuba through

9    distribution branches located in the cities of West Sacramento, Chico, and Truckee. Until events

10   giving rise to this complaint, DBI Sacramento distributed beer manufactured by Seismic.

11        22.    Defendant DBI Beverage San Francisco ("DBI San Francisco") is a California

12   corporation with its principal place of business at 245 South Spruce Street, No. 900, South San

13   Francisco, California. DBI San Francisco is a wholly-owned subsidiary of DBI Beverage. Until the

14   sale of substantially all of its assets to Reyes on or about September 13, 2019, DBI San Francisco

15   was engaged in the business of beer and beverage products distribution in the counties of San

16   Francisco and San Mateo. Until events giving rise to this complaint, DBI San Francisco distributed

17   beer manufactured by Seismic.

18        23.    Defendant DBI Beverage San Joaquin ("DBI San Joaquin") is a California

19   corporation with its principal place of business at 4547 Frontier Way, Stockton, California. DBI

20   San Joaquin is a wholly-owned subsidiary of DBI Beverage. Until the sale of substantially all of its

21   assets to Reyes on or about September 13, 2019, DBI San Joaquin was engaged in the business of

22   beer and beverage products distribution in all or parts of the counties of Alpine, Amador,

23   Calaveras, Mariposa, Sacramento, San Joaquin, Stanislaus, and Tuolumne through distribution

24   branches located in the cities of Stockton and Ceres. Until events giving rise to this complaint, DBI

25   San Joaquin distributed beer manufactured by Seismic.

26        24.    Defendant DBI Beverage San Jose ("DBI San Jose") is a California corporation with

27   its principal place of business at 500 Piercy Road, San Jose, California. DBI San Jose is a wholly-

28   owned subsidiary of DBI Beverage. Until the sale of substantially all of its assets to Reyes on or

about September 13, 2019, DBI San Jose was engaged in the business of beer and beverage products distribution in Santa Clara County. Until events giving rise to this complaint, DBI San Jose distributed beer manufactured by Seismic.

25.      In March 2017, following months of negotiations, Seismic entered into five distribution contracts with DBI (the "Agreements"). The Agreements provided significant protections for Seismic, including that DBI use "best efforts" to distribute Seismic beer, broad termination rights for Seismic in the event DBI failed to meet sales targets, and a veto right in the event DBI sought to assign the Agreements to third parties on unreasonable terms.

26.      On or about September 13, 2019, DBI Beverage sold substantially all of the assets in DBI's Northern California subsidiaries to Reyes in a deal valued at over $550 million to acquire DBI's rights under preexisting distribution agreements with brewers like Seismic.[4]

**C.      The Reyes Defendants**

27.      Defendant Reyes Holdings, LLC ("Reyes") is a Delaware limited liability company with its principal place of business in Rosemont, Illinois, a suburb of Chicago. Reyes is controlled and dominated by the Reyes family, namely, J. Christopher Reyes; M. Jude Reyes; David K. Reyes; William F. Reyes; John J. Reyes; James V. Reyes; and Thomas A. Reyes.

28.      Reyes is the ninth largest privately held company in the United States. Because it is privately held, Reyes has avoided the disclosure and scrutiny to which publicly traded companies are subjected.

29.      According to its website, Reyes is the largest beer distributor in the United States and operates at least fifteen wholly-owned beer-distributor subsidiaries or d/b/as: Defendant Harbor, Allied Beverages, Chesbay Distributing, Chicago Beverage Systems, Crest Beverage, Florida Distributing Company, Gate City Beverage, Gold Coast Beverage, Golden Brands, High Desert Distributing, Lee Distributors, Premium Distributors of Maryland, Premium Distributors of Virginia, Premium Distributors of Washington DC, and Windy City Distributing. Reyes is also the fastest-growing beer distributor in the country.

---

[4] *See* Alex Soderstrom, *David Ingram Sells California Booze Business*, Nashville Business Journal (Jul. 10, 2019), *available at* https://www.bizjournals.com/nashville/news/2019/07/10/david-ingram-sells-california-booze-business.html.

30.     Reyes distributes beer in California through at least six wholly-owned, beer-distributor subsidiaries: Defendant Harbor, Allied Beverages, Crest Beverage, Gate City Beverage, Golden Brands, and High Desert Distributing.

31.     Reyes and its wholly owned subsidiaries comprise a vertically integrated firm whose rapid acquisitions of numerous California beer distributors (including DBI and co-conspirator Elyxir) have concentrated California's distribution market, unlawfully provided Reyes monopoly power over that market, and impaired competition.

32.     Beer distribution in California is dominated by two firms, Reyes and Anheuser-Busch InBev ("Anheuser-Busch"). Reyes and Anheuser-Busch collectively control 90% of the beer distribution market in California. Anheuser-Busch controls 40% of that market, while Reyes—fueled by a rash of unlawful acquisitions over the past two years—now controls more than 50%.

33.     Because it controls more than half of the beer distribution market, and because there are significant barriers to entering the market, Reyes exerts tremendous influence over what ends up on store shelves. As one industry observer wrote, "[c]onsumers may not notice its hand, but the middle tier of the beer industry exerts tremendous influence over what ends up on store shelves."[5] By controlling access to retailers, Reyes can and does pick winners and losers throughout the brewing industry. Reyes has abused and consolidated this power by eliminating brewers' freedom to contract and engaging in an unprecedented series of acquisitions that have placed the beer distribution market under its control.

34.     The effects of Reyes' entrenched market power are costly because Reyes wields its dominance in ways that are eroding California's brewing industry as a whole. Reyes has used its relationship with macrosuppliers—including Constellation Brands ("Constellation"), which imports Modelo, Heineken, and other international beers—to consolidate its grip on the market by forcing smaller distributors to sell to Reyes. Reyes' anticompetitive scheme was to induce Constellation to breach its distribution agreements with small distributors by terminating them without cause. Without Constellation beers, these smaller distributors no longer had sufficient economy of scale to

---

[5] Kate Bernot, *Reyes Comes for the King – California Distributor Bets Hard Seltzer, Mexican Imports Dethrone AB InBev in the Golden State*, GOOD BEER HUNTING (July 10, 2020), *available at* https://www.goodbeerhunting.com/sightlines/2020/7/10/distributor-bets-hard-seltzer-and-mexican-imports-can-dethrone-ab-inbev.

Case No. _____

compete, and were faced with two choices—initiate litigation with Constellation and Reyes that they could not afford, or succumb to Reyes' monopoly power by selling to Reyes. A number of these distributors have publicly stated that they elected to sell to Reyes because they could not afford to vindicate their contractual rights.

35.    After Reyes uses its market power to force smaller distributors to sell out to Reyes, it then uses that same power and the lack of meaningful distribution alternatives to force brewers to abandon their contracted-for rights negotiated with those smaller distributors.

36.    Indeed, Reyes attempted to force Seismic to abandon the contracts it had negotiated at arm's length with DBI and Elyxir (which included favorable termination terms for Seismic), instead demanding that Seismic agree to an onerous form contract that would have made it virtually impossible for Seismic to switch to a competing distributor. When Seismic refused, DBI and co-conspirator Elyxir began pressuring Seismic to abandon its contractual rights and submit to Reyes' anticompetitive contract, all at Reyes' behest and direction.

37.    As detailed below, Reyes has acquired at least fifteen distributorships across California since 2018, including DBI and Elyxir.  Through these acquisitions, Reyes now distributes an additional 76 million annual case equivalents[6] of beer in California.

38.    As a result of these anticompetitive acquisitions, Reyes now distributes more than 235 million case equivalents throughout the U.S. each year—over 163 million of which are distributed in California alone.

39.    As a result of these acquisitions, Reyes has come to distribute approximately 54% of all beer sold in California.

40.    Defendant Harbor Distributing, LLC ("Harbor") is a Delaware limited liability corporation with its principal place of business in Huntington Beach, California. Harbor is a wholly-owned subsidiary of Reyes. Upon information and belief, Reyes is the managing member of Harbor. Like Reyes' other wholly-owned, beer-distribution subsidiaries, Harbor is completely controlled and dominated by the Reyes family.

---

[6] The case equivalent ("CE") is a standard unit of measure for a beer distributor converted as if everything the brewery produced were in cases of 24 12-ounce bottles or cans. One case equals one case equivalent. One brewer's barrel equals 13.78 case equivalents.

41.     Harbor is located in Huntington Beach, California, has registered as an LLC doing business in California, and has a designated agent for service of process in Los Angeles County.

42.     Reyes will be apprised of the service of this Complaint by service on Harbor in California because Harbor is the wholly-owned subsidiary of Reyes, and they are represented by the same counsel, Latham and Watkins.

### 1.     Defendants Reyes and Harbor Operated as a Single Enterprise and are Alter Egos of One Another

43.     Reyes is a private closely-held entity that wholly owns Harbor.

44.     Reyes and Harbor are so organized and controlled, and their affairs are so conducted, as to make them merely an instrumentality, agency, conduit, or adjunct of a single unitary Reyes enterprise. *See Las Palmas Assoc. v. Las Palmas Ctr. Assoc.*, 235 Cal. App. 3d 1220, 1249 (1991). Each Reyes and Harbor affiliate or subsidiary is so dominated in its finances, policies, and practices that these controlled corporations have no separate mind, will, or existence of their own, and are but business conduits for their principal, Reyes, such that all of the affiliated corporations may be deemed to be a single business enterprise. *See Toho-Towa Co., Ltd. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1107 (2013); *Greenspan v. LADT LLC* 191 Cal. App. 4th 486, 514 (2010).

45.     On information and belief, each entity in the Reyes enterprise functions solely for revenues to flow to Reyes and its owners. Harbor and its subsidiaries are analogous to departments within a single Reyes corporation and are run as such, to the point that Harbor employees have Reyes email addresses.

46.     This fact pattern is sufficient to support claims against Reyes on the basis of alter-ego liability, because Harbor and its subsidiaries are constituent parts of the unitary Reyes single enterprise. *See Davis v. Seterus, Inc.,* 21 Cal. App. 5th 283, 305-307 (2018), *Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.,* 217 Cal. App. 4th 1096, 1107 (2013), *Greenspan v. LADT LLC*, 191 Cal. App. 4th 486, 514 (2010), *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1341 (2009), and *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249 (1991).

47.     At deposition, Harbor admitted that Harbor is nothing more than Reyes' presence in California.

**2.      The DBI Defendants Operated as a Single Enterprise and are Alter Egos of One Another**

48.     Defendant DBI Beverage Inc., wholly owns Defendants DBI Beverage Napa, DBI Beverage Sacramento, DBI Beverage San Francisco, DBI Beverage San Joaquin, and DBI Beverage San Jose.

49.     The DBI entities are so organized and controlled, and their affairs are so conducted, as to make them merely an instrumentality, agency, conduit, or adjunct of a single unitary DBI enterprise. *See Las Palmas Assoc. v. Las Palmas Ctr. Assoc.*, 235 Cal. App. 3d 1220, 1249 (1991). Each DBI affiliate or subsidiary is so dominated in its finances, policies, and practices that these controlled corporations have no separate mind, will, or existence of their own, and are but business conduits for their principal, DBI Beverage Inc., such that all of the affiliated corporations may be deemed to be a single business enterprise. *See Toho-Towa Co., Ltd. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1107 (2013); *Greenspan v. LADT LLC* 191 Cal. App. 4th 486, 514 (2010).

50.     On information and belief, each entity in the DBI enterprise functions solely for revenues to flow to DBI and its owners. DBI Beverage Inc.'s subsidiary Defendants are analogous to departments within a single DBI corporation and are run as such.

51.     This fact pattern is sufficient to support claims against DBI on the basis of alter-ego liability, because DBI and its subsidiaries are constituent parts of the unitary DBI single enterprise. *See Davis v. Seterus, Inc.,* 21 Cal. App. 5th 283, 305-307 (2018), *Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.,* 217 Cal. App. 4th 1096, 1107 (2013), *Greenspan v. LADT LLC*, 191 Cal. App. 4th 486, 514 (2010), *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1341 (2009), and *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249 (1991).

52.     At deposition, DBI confirmed that DBI Beverage, Inc.'s subsidiaries are nothing more than DBI's presence in various California counties and are run as a single organization.

### D.     Co-Conspirator Elyxir Distributing LLC

53.     Co-conspirator Elyxir Distributing LLC ("Elyxir") is a California limited liability corporation with its principal place of business in Watsonville, California. Until the sale of substantially all of its assets to Reyes on or about August 21, 2020, Elyxir was engaged in the business of beer and beverage products distribution in all or parts of the Monterey Bay Area, including Santa Cruz, Monterey, and San Benito counties. Until events giving rise to this complaint, Elyxir distributed beer manufactured by Seismic.

### E.     Defendants' Conspiracy and Group Action Allegations

54.     Defendants are jointly and severally liable for the acts and omissions of their co-conspirators and for all damages caused by the conspiracy.

55.     Beginning at least in or around the summer of 2019, Defendants entered into and engaged in continuing unlawful agreements for the purpose of further monopolizing the market for beer distribution in California. Defendants knowingly and intentionally conspired with each other with the specific intent to concentrate Reyes' monopoly power throughout California and for the purposes of destroying fair competition.

56.     Defendants have monopolized, attempted to monopolize, and conspired to monopolize the beer distribution market in California. They are willfully maintaining and abusing a monopoly; leveraging their supply monopoly to control distribution and price; preventing other market participants, including Seismic, from acquiring competitive distribution agreements; blocking Seismic and other craft brewers from competing by eliminating its freedom to contract; and allocating the supply and distribution markets among themselves.

57.     In furtherance of the conspiracy, Defendants collectively agreed as part of Reyes' acquisitions to force Seismic and other craft brewers to negotiate new, anticompetitive distribution agreements upon the purported sham assignments of Seismic's distribution rights. Indeed, Reyes attempted to force Seismic to abandon the contracts it had negotiated at arm's length with DBI and Elyxir (which included favorable termination terms for Seismic), instead demanding that Seismic agree to an onerous form contract that would have made it virtually impossible for Seismic to switch to a competing distributor. When Seismic refused, DBI and co-conspirator Elyxir began

pressuring Seismic to abandon its contractual rights and submit to Reyes' anticompetitive contract at Reyes' behest and direction.

58.    In September 2019, DBI announced that it intended to assign Seismic's distribution rights to Reyes. But Reyes refused to accept assignment of DBI's contract with Seismic. Instead, Reyes pressured Seismic to sign new distributor agreements that eviscerated the protections that existed in the DBI Agreements. Seismic accordingly exercised its right to make reasonable requests for information from Reyes. In response, and at Reyes' direction, DBI began pressuring Seismic to abandon its contractual rights.

59.    In June 2020, co-conspirator Elyxir announced that it intended to assign Seismic's distribution rights to Reyes. In a carbon copy of the post-acquisition, sham-assignment conspiracy culminating in the DBI acquisition, Reyes again sought to foist the same anticompetitive, anti-brewer distribution agreements upon Seismic. Seismic exercised its right to refuse consent to the proposed assignment. As with DBI, Elyxir began pressuring Seismic to abandon its bargained-for contractual rights, all at Reyes' direction.

60.    The anticompetitive contract Reyes, Elyxir, and DBI have attempted to force Seismic to execute contains materially less favorable terms for Seismic, including as to termination. Signing that contract would have made it much more difficult for Seismic to end its distributor relationship and seek to engage a new distributor. On information and belief, Reyes has similarly conspired with other acquisition target distributors to try and force beer manufacturers into these kinds of anticompetitive contracts, all to create further barriers for any competing distributor that seeks to enter the market or increase their market share.

61.    Defendants also conspired to retaliate against Seismic and others who did not fall in line with their anticompetitive plans. For example, after Seismic refused to accede to DBI's conspiracy, Reyes placed "bounties" that targeted Seismic's points of distribution in a retaliatory manner. Upon information and belief, bounties were arranged to incentivize DBI's and Reyes' salespeople to cause Seismic to lose permanent "tap handle" placements at its important retail accounts, and were specifically motivated by a desire to punish Seismic for refusing to agree to

1  Reyes' form contract. Similar attacks targeted other craft brewers that rejected DBI's sham

2  assignments.

3  <u>**FACTS**</u>

4  **A.**     **California's Craft Beer Revolution**

5       62.     When Fritz Maytag purchased Anchor Brewing Company in San Francisco in 1965,

6  he truly revolutionized craft brewing. Anchor was America's first craft brewery and launched an

7  industry that in California in 2018 employed more than 61,000 people in full-time jobs, paid over

8  $905 million in state and local taxes, and contributed over $9 billion to California's economy.[7]

9       63.     California heavily regulates beer distribution. The three-tier system separates

10 breweries, distributors, and retailers into three distinct tiers. With some exceptions, breweries may

11 sell only to distributors, distributors to retailers, and retailers to consumers. In addition, the

12 Business and Professions Code, Section 25000 *et seq.*, imposes significant handcuffs on brewers,

13 including mandatory break fees and forced arbitration. Most of those provisions, however, are

14 subject to contractual negotiations between brewers and distributors.

15       64.     Reyes' massive distributor consolidation is also revolutionizing California's craft

16 beer industry in a most anticompetitive way. Reyes has acquired at least fifteen California

17 distributors since 2017. Between Reyes' form contracts and California's legal framework, these

18 transactions mean that affected brewers are effectively stuck with Reyes.

19       65.     In many territories, craft brewers are also effectively stuck with Reyes as a result of

20 consolidation that has left few, if any, alternative distributors for many markets. In the 1990s, even

21 regional markets in the state were usually served by upwards of four or more different distributors.

22 Today, most markets are typically limited to two or three distributors, often affiliated with

23 MolsonCoors and/or Anheuser-Busch, which favor their own brands. The US Treasury's recent

24 report on competition issues in the alcohol industry recounts the pernicious effects of this

25 concentration upon competition, especially as to craft brewers:

26          [S]o-called "independent" beer distributors tend to be affiliated with
           either ABI or Molson Coors, because they sell large volumes of either
27          ABI products or Molson Coors products, respectively. This leads to

28  ───────────
[7] California Craft Brewers Association, *supra* note 1.

many local markets being served by two large distributors—each affiliated with either ABI or Molson Coors—and most other brewers must rely on one or the other to get to market. Consequently, the majority of other brewers' beers are distributed either by the ABI-affiliated distributor or the Molson Coors-affiliated distributor in a given geographic area, although in some geographic areas, a handful of small boutique distributors are also present. One commenter described this dynamic as "a duopoly that together holds ninety percent or greater of the beer market in a specific geographic territory" and commented that "[t]his distribution choke point, in turn, helps entrench dominant beer suppliers by forcing smaller brands to compete for 'share of mind' in a highly consolidated distribution channel that prioritizes existing major brands." The commenter continued to observe that in markets served by ABI's wholly owned distributors "virtually every small supplier has no choice but to seek distribution through [the Molson Coors-affiliated distributor]", leaving small brewers "with a single effective distribution option – a monopoly – in that territory."

Federal Alcohol Competition Report at 25-26. The lack of distribution options also excludes craft brewers from desired retailers and shelf space, and exposes them to implied or actual retaliation, as happened to Seismic. In such a highly concentrated market, with such high barriers to entry, Reyes has foreclosed meaningful alternatives for craft brewers to be able to deliver their products to the adoring public.

66.     As a result, California currently sees much less competition at the distributor level than it would in a competitive market. It sees much less choice for retailers and consumers. This imbalanced market enables Reyes to obtain potential monopoly pricing and reduce the services it provides while charging the same price.

67.     The few alternative distributors that remain are unable to operate at economies of scale to compete with the monopsony. And when craft brewers are not able to access economies of scale as they used to, they must charge higher prices, or cut into their already-thin margins.

**B.      Seismic is Founded by Friends in Sonoma to Brew Sustainable Beer**

68.     Seismic is an award-winning brewery located in Sonoma. It was founded in 2015 by a group of friends who shared a passion for high quality craft beer and were devoted to quality from grain to glass. Seismic strives to be a responsible user of the planet's resources through conservation and sustainability while being a creative force in the brewing community and beer industry.



69.     Seismic's brewery, which first began construction around February 2016, and which took nearly a year to build, reflects its commitment to develop a portfolio of high-quality beers, brewed and brought to market in an environmentally sustainable manner.

70.     For example, as part of a collaboration with Cambrian Innovation, Seismic's brewery uses the first EcoVolt MINI, an apparatus that leverages electrogenic bacteria, enabling it to essentially ferment the brewery's wastewater into clean water, which it then uses for its other brewery functions.

71.     During the typical brewing process employed by most brewers, approximately 8-10% of the brew simply evaporates into the atmosphere during the boiling stage. So Seismic also partnered with BrauKon to help design a custom kettle steam condenser. The steam condenser recondenses this lost steam into water, which the EcoVolt unit can then reclaim. Simultaneously,

the condenser recaptures heat from the steam by running ambient temperature water through pipes; through simple heat exchange, Seismic is able to send that water to its hot brewing liquor tank to be used in future brews.

72.     Seismic's brewery is also committed to only using re-usable energy: as an "EverGreen" customer of Sonoma Clean Power, Seismic obtains all of its energy from geothermal energy produced by geysers in Sonoma County.

73.     Seismic's beer has won multiple awards, including the Wine, Beer + Spirits Industry award in the category for Brewmaster, Small Brewery in 2018.

74.     More recently, Seismic won a 2021 Good Food Award for its "Alluvium" California pilsner, which is brewed with 100% California grown and malted barley. In 2020, the prestigious Great American Beer Festival awarded Seismic a silver medal for "Tremor California," a light lager that is grown, malted, and brewed in California, while its "Chardonnay Barrel Fermented Liquifaction Kölsch Style Ale" took home a silver medal at the 2020 U.S. Open Beer Championship. Seismic also booked top honors from the Craft Beer Marketing Awards for best tap handle design in the sustainable category.

**C.     Seismic's Distribution Agreements with DBI**

75.     When Seismic was founded in 2015, it knew it would need a competent and competitive distributor to help sell its unique beer.

76.     At the time, DBI generated roughly $615 million in revenue and distributed 30 million case equivalents annually.[8] It was one of the largest distributors in California and one of the largest of its kind in the country, with distributorships in nine California markets: Chico, Modesto, Napa, Sacramento, San Francisco, San Joaquin, San Jose, Truckee, and Ukiah.

77.     Seismic spent four months between September and December 2016 conducting extensive due diligence on DBI, including multiple on-site visits, to ensure the relationship would work for both parties.

---

[8] Brewbound, *DBI Beverage Inc. Names Mark Ramer CEO* (Dec. 14, 2015), *available at* https://brewbound.com/news/dbi-beverage-inc-names-mark-ramer-ceo/.

Case No. _____

78.     After deciding DBI was a good fit, Seismic then spent another four months between December 2016 and March 2017 engaging in protracted, commercial, arms-length negotiations with DBI and DBI's Northern California subsidiaries.

79.     On or about March 10, 2017, Seismic and DBI entered into the Agreements, granting DBI the exclusive distribution and sales rights of Seismic's beer across the geographic territories of Napa, Sacramento, San Francisco, San Joaquin, and San Jose. (**Exhibits 1–5**.)

80.     While DBI, the much larger entity, initially insisted on boilerplate, pro-distributor contract terms, Seismic eventually secured many significant protective provisions in its Agreements with DBI, including:

    a.     DBI's agreement to "use best efforts to develop and increase the sale of" Seismic's beer (Exs. 1–5, at 4, ¶ 5(a)).

    b.     Quality control oversight (*id.* at 4–5, ¶¶ 5(b), (e)).

    c.     Sales benchmarks/goals (*id.* at 5 & 14, ¶¶ 5(f) & 9(d)).

    d.     Control over an annual marketing and sales plan (*id.* at 10, ¶ 6(h)).

    e.     Rights to terminate the agreements without cause (*id.* at 13, ¶ 9(c)).

    f.     Agreed-upon and reasonable break fee in event that outright termination was not provided for in the parties' agreements (*id.* at 14, ¶ 9(e)).

    g.     Rights to reasonably withhold consent to any unreasonable assignment of the parties' relationship (*id.* at 16, ¶ 11(a)(ii)).

81.     As a non-traditional craft brewer that has cultivated a strong following based on the quality of its beer, its environmentally progressive manufacturing processes, and its personal marketing touch, Seismic would never have partnered with DBI without assurances that DBI would be a steward of Seismic's brand. Nor would Seismic have agreed to enter into agreements that did not include the above contractual protections embodied in the Agreements.

82.     Similarly, in March 2018, Seismic entered a distribution agreement with Elyxir (the "Elyxir Agreement"). The Elyxir Agreement provided the same significant protections for Seismic that were in the DBI Agreements, including that Elyxir use "best efforts" to distribute Seismic beer,

1   broad termination rights for Seismic in the event Elyxir failed to meet sales targets, and a veto right

2   in the event Elyxir sought to assign the Elyxir Agreement to a third party on unreasonable terms.

3   83.     Seismic lost these relationships and was ultimately left scrambling to cover these

4   territories due to Reyes' rapid-fire consolidation of the beer distribution market, including its

5   acquisitions of DBI and Elyxir.

6   **D.    Reyes Begins to Consolidate Beer Distribution in California**

7   84.     Reyes initiated its conspiracy to concentrate and consolidate the California beer

8   distribution market no later than 2018. The first phase involved a massive business expansion in

9   Southern California. First, Reyes consolidated Constellation Brands' distribution rights from at

10  least four California beer distributors: Markstein Beverage Co. in San Marcos; Triangle Beverage

11  in Santa Fe Springs; Ace Beverage in Los Angeles; and Beauchamp Distributing Company in

12  Compton. Constellation Brands accounted for an estimated 30-45% of each of the selling

13  distributors.

14  85.     Upon information and belief, Reyes forced each of these California beer distributors

15  to sell their Constellation Brands' distribution rights to Reyes under anticompetitive circumstances.

16  On August 23, 2018, Reyes began investing in an enormous 355,000 square foot warehouse near

17  Los Angeles. Weeks later, Constellation Brands notified these distributors that they were required

18  to sell Constellation's distribution rights to Reyes because they wanted to work with a larger

19  distributor.

20  86.     In announcing Reyes' acquisition of Constellation Brands' distribution rights from

21  numerous distributors throughout Southern California, a Constellation spokesperson said: "As the

22  industry evolves and increases complexity, we believe the distributor tier will continue to

23  consolidate. . . . [T]he changes we've made to unify our route to market in SoCal are about best

24  positioning us for long-term health and success of our business and the industry."

25  87.     At the time, Triangle president Peter Heimark noted that Reyes had already started

26  construction of its new warehouse within a half mile of Triangle's warehouse, weeks before

27  Triangle was notified of the termination. He said at the time: "Whether or not Constellation

28  guaranteed that [Reyes] would get the business, I guess that remains to be debated[.] But they were

1  certainly notified by Constellation ahead of time that we would be terminated. I can't imagine they

2  would have built a warehouse two blocks from me otherwise."

3          88.     Not long after, Reyes turned to phase two of its plan: northern expansion. In or

4  about February 2019, Reyes acquired Central Coast Distributing, which distributed Constellation

5  and craft brands in San Luis Obispo County and Santa Barbara. Thus, Reyes began to stretch its

6  southern empire northwards along the coast.

7          89.     In June 2019, Reyes announced that it would acquire all of DBI's assets in Northern

8  California, and did so in September. The DBI acquisition gave Reyes a monumental foothold in

9  Northern California. This was core to the next phase of Reyes' plan, which was intended to extend

10 and replicate Reyes' anticompetitive dominance in Southern California into Northern California.

11         90.     Reyes did not stop there. Later that year, Reyes acquired W.A. Thompson of

12 Bakersfield and shortly thereafter, acquired Claypool Distributing of Imperial, expanding inland.

13         91.     In mid-2020, Reyes tripled down on its presence in Northern California by acquiring

14 Saccani Distributing of Sacramento, Bay Area Beverage of Richmond, and co-conspirator Elyxir of

15 Watsonville in rapid succession. In particular, Reyes' acquisition of Bay Area Beverage united

16 Reyes' overall Northern California footprint and provided it with a dominant position in Alameda

17 and Contra Costa counties.

18         92.     As one beer reporter put it: "Reyes' distributor acquisitions might be the only part of

19 2020 that's been predictable."[9] And Reyes is not finished consolidating this market. Upon

20 information and belief, Reyes recently acquired the distribution rights to several powerhouse

21 brands from Seismic's current distributor in San Francisco, further increasing Reyes' market share

22 in Northern California. COVID-19 has severely impacted cash flow for many breweries,

23 distributors, and retailers, and this is a time when many without cash reserves are vulnerable.

24      **E.    DBI's Conspiracy with Reyes to Consolidate Control of the Beer Distribution
               Market**

25

26         93.     In September 2019, DBI announced that it intended to assign Seismic's distribution

27 rights to Reyes. But Reyes refused to accept assignment of DBI's contract with Seismic. Instead,

28

---

[9] Bernot, *supra* note 5.

Reyes pressured Seismic to sign new distributor agreements that eviscerated the protections that existed in the DBI Agreements. Seismic accordingly exercised its right to make reasonable requests for information from Reyes. In response, and at Reyes' direction, DBI began pressuring Seismic to abandon its contractual rights.

94.     In June 2020, co-conspirator Elyxir announced that it intended to assign Seismic's distribution rights to Reyes. In a carbon copy of the post-acquisition, sham-assignment conspiracy culminating in the DBI acquisition, Reyes again sought to foist the same anticompetitive, anti-brewer distribution agreements upon Seismic. Seismic exercised its right to refuse consent to the proposed assignment. As with DBI, Elyxir began pressuring Seismic to abandon its bargained-for contractual rights and threatened to file a lawsuit, all at Reyes' direction.

95.     The anticompetitive contract Reyes, Elyxir, and DBI have attempted to force Seismic to execute contains materially less favorable terms for Seismic, including as to termination. Signing that contract would have made it much more difficult for Seismic to end its distributor relationship and seek to engage a new distributor.

96.     On information and belief, Reyes has similarly conspired with other acquisition target distributors to try and force beer manufacturers into these kinds of anticompetitive contracts, all to create further barriers for any competing distributor that seeks to enter the market or increase their market share.

**F.     The Relevant Market for Craft Beer Distribution**

97.     Reyes possesses a dominant share of the relevant product and geographic markets for craft beer distribution services in the State of California. There is evidence of significant barriers to entering this market, and the few remaining competitors lack the capacity to increase their distribution output in the short run.

**1.     The Relevant Product Market is Craft Beer Distribution Services in California**

98.     The relevant product market in this action is for craft beer distribution services in California. Craft distribution differs from macro-beer distribution in that craft distribution requires greater attention to brand management, quality control, and follow up with retailers.

99.     The Brewers Association defines "craft" as "small," meaning annual production of 6 million barrels of beer or less, and "independent," meaning less than 25 percent of the brewery is owned or controlled by a beverage alcohol industry member that is not itself a craft brewer.[10] Nevertheless, Big Beer often tries to claim the craft mantle.

100.     Beer distribution in California is dominated by two firms, Reyes and Anheuser-Busch. Reyes and Anheuser-Busch collectively control 90% of the beer distribution market in California. Anheuser-Busch controls 40% of that market, while Reyes—fueled by a rash of unlawful acquisitions over the past two years—now controls more than 50%.

101.     Much of the broader beer distribution writ large is tied up in the "red" network— which distributes Anheuser-Busch products and is thus dominated by Anheuser-Busch—and the "blue" network—which distributes MolsonCoors products and thus is dominated by MolsonCoors. Harbor's Vice President and person-most-qualified witness, Ned Hall, confirmed the existence of the red and blue networks. Because Anheuser-Busch and MolsonCoors have brands that they try to position as 'craft' beers (despite not meeting the Brewers Association trade group's definition of being less than 25% percent owned by non-craft brewers), their distributors have little incentive to aggressively market and sell true craft beers. Thus, craft beer distribution tends to be limited to independent distributors who are not part of the red or the blue networks. The US Treasury's recent report on competition in the alcohol industry recognized this market dynamic:

> [T]he beer industry has . . . seen additional consolidation resulting from the larger brewers, namely ABI, and to a lesser extent Molson Coors, acquiring craft brands throughout the United States. ABI has been active in this space, acquiring over ten craft beers throughout the country since 2011. More recently, in 2020 Molson Coors acquired Michigan-based Atwater. Smaller brewers often express concern that these acquisitions of leading craft beers across the country allow ABI and Molson Coors to extend their market power and to hinder the growth of competitive brands. One commenter noted, for example, that "suppliers leverage their position as the key partners to their wholesaler distribution networks to ensure that their brands in every category—established or emerging—receive outsized wholesaler sales and distribution efforts." Small brewers highlight that by purchasing ownership of strong brands across all beer segments and wielding influence over distributors (or direct control in the case of ABI's wholly-owned distributors), a large brewer can often obtain preferred

---

[10] Brewers Association, *Craft Brewer Definition*, available at https://www.brewersassociation.org/statistics-and-data/craft-brewer-definition/.

shelf space in grocery stores and tap handles in bars and restaurants, displacing their rivals' brands, especially smaller craft brands.

Small brewers are concerned that these acquisitions may pose the risk that larger brewers extend their market power into the super-premium (craft beer) segment and incentivize distributors to reduce their efforts to sell competing craft beers, drop them entirely, or refrain from taking on new craft beers.

While these craft beer acquisitions may not significantly increase market concentration in a particular geographic territory, they may still, by their effects on distribution, operate to protect the largest firms from competition, and substantially lessen competition in a manner that implicates Section 7 of the Clayton Act. If the craft brewers' access to large distributors that sell ABI or Molson Coors beer were reduced or eliminated, these competing craft brewers could be forced to use smaller, less efficient distributors that typically receive inferior treatment at retail establishments. In addition, if a larger number of craft beer brands were pushed into a smaller distributor, that may increase the complexity and cost of distribution, which could also increase the distributor's incentive to raise the price of all of its craft beer brands. Similarly, as the number of brands carried by a distributor increases, the distributor may become less focused on promoting the smaller brands that it carries. And, as discussed above, state franchise laws often may make it very difficult for a brewer to switch distributors, brewers have little recourse should the distributor hamper the brewer's growth.

Federal Alcohol Competition Report at 31-32.

102.    California needs efficient independent distributors to support a healthy craft brewing industry. Distributor competition allows California's craft beer industry to flourish because it forces distributors to compete on service and other vectors, which opens up economies of scale to small, independent brewers.

103.    In the alternative, the relevant product market in this action is for beer distribution services generally.

104.    Due to state and federal law and licensing requirements, there are no substitutes available to craft brewers for beer distribution services.

### 2.    The Relevant Geographic Market is the State of California

105.    The relevant geographic market is the State of California. Because of California licensing requirements, there is no competitive pressure in the craft beer distribution services market from outside of California.

Case No. _____

106.     Reyes is able to leverage its dominance in one part of the State of California to coerce suppliers into anticompetitive agreements in other parts of the State of California. Because a supplier whose rights Reyes has purchased has virtually no ability (if any) under Reyes' contracts to switch distributors if Reyes elects not to promote and push their product, Reyes is able to and does pressure suppliers to agree to Reyes distribution in other parts of the State of California, even if the supplier has the nominal right not to agree to Reyes distribution in that new territory within California.

107.     In the alternative, the relevant geographic markets are Northern and Southern California, both of which Reyes have obtained monopolies over via anticompetitive acquisitions.

### 3.     There are Significant Barriers to Entering the California Beer Distribution Market

108.     There are substantial barriers to entering the California beer distribution market that have helped Reyes obtain and maintain its anticompetitive control over the market.

109.     There are significant structural barriers to entry into the beer distribution market. Beer distribution is a highly regulated industry. New beer distributors must undergo extensive licensing processes with both the United States Alcohol and Tobacco Tax and Trade Bureau, as well as the California Department of Alcoholic Beverage Control.

110.     Once a new distributor completes its licensing processes, it must then obtain distribution customers quickly because profitable beer distribution depends upon economies of scale. There are, however, yet more structural barriers to winning customers and market share because California's statutory three-tier system makes it very difficult and expensive for brewers to change distributors.

111.     California Business and Professions Code Section 25000 *et seq*. imposes significant restrictions upon a beer manufacturers ability to switch distributors. For example, a brewer may not terminate a distributor for failure to meet sales goals or quotas, *see* Section 25000.7, and is potentially liable in damages even for switching distributors when its existing distributor contract is sold or assigned, *see* Section 25000.9. These statutes restrict beer manufacturers from giving competing distributors their business and market share. And even if a beer manufacturer selects a

new distributor, that distributor must pay the former distributor "the fair market value of the affected distribution rights," which must be established in an arbitration if agreement on fair market value cannot be reached. Section 25000.2. Finally, distributors cannot compete by selling a particular beer into the same area—instead, distribution agreements must provide territorial exclusivity, and those arrangements must be filed with the State of California. Section 25000.5.

112.    There are also significant front-end investments involved in opening a new distributor, including investing capital in significant refrigeration and trucking capabilities. These kinds of capital-intensive up-front costs make quickly reaching economies of scale even more essential—but that is rendered impossible because Reyes and Anheuser-Busch have already locked up beer manufacturers into exclusive contracts that are protected by the structural barriers described above.

113.    Beer distributors have utilized their statutorily provided market power to further restrict new distributors' ability to pry away market share and reach economies of scale. The adhesion contracts Reyes has been imposing upon brewers provide that brewers may be liable to Reyes after switching distributors for further "fair market value" payments above and beyond the "fair market value" payment made by the new distributor under Business and Professions Code § 25000.2. The effect of these restrictive termination provisions—which are widespread throughout the industry—has been to create a network of exclusive contracts and distribution arrangements designed to locked out potential competitor distributors from entering the market.

114.    Harbor's Vice President, Ned Hall, confirmed at Harbor's person-most-qualified deposition that the termination rights of prior distributors, state and federal licensing requirements, and front-end capital investments are barriers to entering the beer distribution market:

Q. So for a new distributor to start business out of the blue, we've identified a few challenges; right? One is lack of experience and relationships; right?

A. Yes.

Q. Another is the fact that typically contracts don't provide for termination with cause; right -- excuse me, without cause?

A. Correct.

Q. Another is the fact that I would have to become licensed; right?

A. Correct.

Q. And I would have to be licensed with the state and the federal government; correct?

A. Yes.

. . .

Q. And I also would need to invest capital in a warehouse and a fleet of trucks; right?

A. Yes.

. . .

Q. . . . And if the supplier couldn't terminate without cause, I would have to buy the rights from, say, Reyes; right?

[Objections.]

THE WITNESS: That is an option that you could pursue.

BY MR. FISHER: Q. And so you would agree with me that these are all barriers to entering this beer distribution market in the state; right?

[Objections.]

THE WITNESS: I would say those are barriers to entering the beer distribution market.[11]

115.    This lockup of distribution rights inflicts particularly harm smaller craft brewers like Seismic. As academic observers of the beer market have noted, "competition among craft brewers occurs primarily in their method of distribution. The costs and barriers associated with expanding their distribution can prohibit outright expansion without secondary funding. . . . it's exceptionally difficult for craft brewers to expand beyond local distribution simply through organic growth." Alistair Williams, *Exploring the Impact of Legislation on the Development of Craft Beer*, BEVERAGES 2017 3(2), 18 (2017).

**G.    The Beer Distribution Market is Highly Concentrated as Defined by Law**

116.    The Clayton Act prohibits any merger whose effect "may be substantially to lessen competition, or to tend to create a monopoly." *Optronic Techs., Inc v. Ningbo Sunny Elec. Co.*, F.

---

[11] Jan. 6, 2021 Deposition of Person Most Qualified of Harbor Distributing, LLC, Ned Hall ("Harbor Dep."), at 173:7-175:17.

Supp. 3d, No. 5:16-CV-06370-EJD, 2020 WL 1667435, at *9 (N.D. Cal. Apr. 3, 2020) (quoting 15 U.S.C. § 18) (holding jury verdict in private plaintiff case finding that merger violated Clayton Act was supported by substantial Herfindahl-Hirschman index evidence). California Unfair Competition Law's unlawfulness prong imports this analysis into the UCL. *See Cel Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) ("[T]he word "unfair" in [Section 17200] means conduct that threatens an incipient violation of an antitrust law."); *see also California v. Valero Energy Corp.*, No. C 17-03786 WHA, 2017 WL 4122830, at *5 (N.D. Cal. Sept. 17, 2017) ("[T]he analysis under Section 17200 proceeds along the same lines as the analysis under the Clayton Act."); *In re Apple iPod iTunes Anti-Tr. Litig.*, No. C 05-00037 JW, 2010 WL 2629907, at *5 (N.D. Cal. June 29, 2010) ("Defendant moves to dismiss Plaintiffs' UCL claim on the ground that it is premised on Plaintiffs' Section 2 claim. In light of the Court's finding that Plaintiffs have adequately stated a Section 2 claim, Plaintiffs have also adequately stated a UCL claim under the 'unlawfulness' prong."); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003) ("Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices.") (holding that violations under federal Foreign Corrupt Practices Act are actionable under UCL).

117.    To determine whether a merger would lessen competition or tend to create a monopoly, the law looks to the concentration of the market before and after the merger.

118.    The antitrust laws use a metric known as the Herfindahl-Hirschman index ("HHI") to measure industry concentration. HHI is calculated by summing the squares of an industry's competitors' market shares. Thus, a market controlled by a perfect monopoly in which a single firm possessed 100% market share would have an HHI of 10,000,[12] while a market with one hundred participants who each had 1% market share would have an HHI of 100.[13]

119.    The antitrust laws "classify markets as (1) unconcentrated (HHI below 1500); (2) moderately concentrated (HHI between 1500 and 2500); or (3) highly concentrated (HHI above 2500)." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 786 (9th

---

[12] *I.e.*, 100 x 100 = 10,000.
[13] *I.e.*, (1 x 1) + (1 x 1) + (1 x 1) . . . = 100.

Cir. 2015); *see also* U.S. DOJ & FTC Horizontal Merger Guidelines § 5.3. "Mergers that increase the HHI more than 200 points and result in highly concentrated markets are 'presumed to be likely to enhance market power'" for purposes of the Clayton Act. *St. Alphonsus*, 778 F.3d at 786 (quoting *ProMedica Health Sys., Inc. v. FTC,* 749 F.3d 559, 568 (6th Cir. 2014)).

120.    Market share can be calculated using revenue, sales, or in some cases, number of products, employment, or hiring. Here, market share can be based on the number of case equivalents shipped by beer distributors.

121.    According to the National Institute of Health, California consumers purchase 679,723,000 gallons of beer annually.[14] Given that one gallon equals 2.25 cases of beer, Californians purchase approximately 302 million cases of beer each year.

122.    Since mid-2018, Reyes has been on a buying spree in California, acquiring distributors and adding over 76 million cases to its annual market share:

| Date | Acquisition | Volume Added |
|---|---|---|
| June 2018 | Constellation Brands from Markstein Beverage | ~2,000,000 cases |
| October 2018 | Constellation Brands from Beauchamp Distributing | ~700,000 cases |
| October 2018 | Constellation Brands from Triangle Distributing | ~3,400,000 cases |
| December 2018 | Constellation Brands from Ace Beverage | ~7,000,000 cases |
| February 2019 | Central Coast Distributing | ~2,600,000 cases |
| September 2019 | DBI | ~28,000,000 cases |
| December 2019 | W.A. Thompson | ~7,100,000 cases |
| March 2020 | Claypool Distributing | ~650,000 cases |
| May 2020 | Saccani Distributing | ~1,500,000 cases |
| June 2020 | Bay Area Beverage Co. | ~8,000,000 cases |
| August 2020 | Elyxir | ~2,500,000 cases |
| April 2021 | Redding Distirbuting Co. | ~2,000,000 cases |
| November 2021 | Classic Beverage | ~6,800,000 cases |

---

[14] Nat'l Inst. Health, *Apparent Per Capita Alcohol Consumption, National, State, and Regional Trends* 1977–2017, Table 2 (2018), *available at* https://pubs.niaaa.nih.gov/publications/surveillance113/tab2_17.htm.

| January 2022 | Stone Brewing Co. / AleSmith | ~300,000 cases |
|---|---|---|
| April 2022 | Columbia Distributing | ~4,000,000 |
| **TOTAL:** | | **~76,550,000 cases** |

123.    In March 2020, Seismic served a subpoena on Reyes seeking market share data. On December 18, 2020—after this Court and the Court of Appeal issued three separate orders directing Reyes to comply—Reyes finally produced responsive data. That data reveals that Reyes' annual California sales—*excluding Reyes' new acquisitions listed in Paragraph 122 above*—accounted for over 118 million cases of sales in California, *i.e.*, 39% of the California market.

124.    Reyes' internal data further discloses Reyes' estimate of annual sales *including* many of the acquisitions listed in Paragraph 122: 162,000,000 cases, or 54% of the total California market.[15]

125.    The estimates in Reyes' internal data exceeds the Federal Trade Commission's estimate of Reyes' market share, which noted that "Reyes is estimated to distribute nearly 100 million cases of beer per year in California—approximately one third of all the beer sold in California."[16] Indeed, as shown above, Reyes' own estimate of its 2020 California market share exceeded the FTC's estimate by over 60%.

126.    At deposition, Harbor's person-most-qualified witness and Vice President, Ned Hall, confirmed that Reyes' total annual volume in California was no less than 155,887,000 cases—a figure which excludes subsequent acquisitions of volume not reflected in data produced by Reyes.

127.    Alcohol industry watchdog groups estimate that Anheuser-Busch controls 40% of California's beer distribution market.[17]

---

[15] A number of the acquisitions set forth in Paragraph 122 – which were publicly announced – were not accounted for in the data, suggesting that Reyes' market share may be even higher than alleged here. The full extent of Reyes' market share will be revealed in discovery.

[16] Letter from FTC to Hon. Jim Wood, (Mar. 20, 2020), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/joint-comment-ftc-staff-doj-antitrust-division-staff-california-state-assembly-concerning-california/v200008_california_beer_distribution_advocacy_2020.pdf.

[17] Open Letter from Executive Director Bruce Lee Livingston of Alcohol Justice to California Attorney General Xavier Becerra at 2 (Dec. 15, 2020), *available at* https://alcoholjustice.org/images/downloadables/ABI/AG-Becerra-Alcohol-Justice-Antitrust-request-1.pdf.

128.    Thus, even without taking into account any other competitors, Reyes and Anheuser-Busch's market shares alone demonstrate that California's beer distribution market was highly concentrated before the string of acquisitions listed in Paragraph 122. Summing the squares of 39% and 40% provides an HHI of 3,121—far exceeding the law's 2,500 HHI threshold for defining a highly concentrated market.

**H.    Reyes' Acquisitions are Presumptively Unlawful Under the Clayton Act**

129.    The HHI of the California beer distribution market after Reyes' string of acquisitions in Paragraph 122 demonstrate that these acquisitions are presumptively unlawful and anticompetitive.

130.    Again, without taking into account any other competitors, Reyes and Anheuser-Busch's market shares alone demonstrate that California's beer distribution market was further concentrated by over 1,400 HHI points as a result of Reyes' acquisitions. Summing the squares of 54% and 40% provides an HHI of 4,516—an increase far exceeding the law's 2,500 HHI point threshold for a presumptively anticompetitive acquisition in a highly concentrated market. *See St. Alphonsus*, 778 F.3d at 786 ("Mergers that increase the HHI more than 200 points and result in highly concentrated markets are 'presumed to be likely to enhance market power'" for purposes of the Clayton Act.) (quoting *ProMedica,* 749 F.3d at 568); *see also Optronic Techs.*, F. Supp. 3d, No. 5:16-CV-06370-EJD, 2020 WL 1667435, at *9 (N.D. Cal. Apr. 3, 2020) ("Dr. Zona analyzed the Meade acquisition's effect on the Herfindahl-Hirschman Index ('HHI') for the market and found that following the acquisition, the HHI spiked more than 1000 points. [Citation] This jump in HHI is substantial evidence that the Meade acquisition's effect 'may be substantially to lessen competition, or to tend to create a monopoly.'") (quoting 5 U.S.C. § 18).

131.    On information and belief, Reyes's unlawful acquisition spree was launched with the specific intent to monopolize the California beer distribution market.

**I.    Reyes Used Its Monopoly Power to Force Its Anticompetitive Acquisitions**

132.    Reyes has used its monopoly power to repeatedly force anticompetitive acquisitions of distribution rights from California beer distributors in the past four years.

133.    Mass-market brands do not own their distribution networks, which would be a violation of the three-tier system. But they effectively control them. Even in a declining market, there is significant money to be made in distributing the best-known beer brands, and distributors want to keep their biggest clients happy. For Reyes, this is Constellation Brands.

134.    Constellation Brands' Chicago-based beer business produces and markets popular imported Mexican beer labels Corona, Modelo and Pacifico, as well as craft offerings from Ballast Point. Crown Imports LLC is a unit of Constellation Brands that imports these Mexican brands that Reyes then distributes throughout California.

135.    Corona and Modelo are among the best-selling beers in California. According to IRI data, Modelo generated $340M in sales between January and June 2020 in California's grocery, drug, and retail stores.

136.    In the past two years, Reyes has acquired distribution rights to Constellation Brands' beer offerings from at least four California beer distributors. In separate deals, Reyes acquired the Constellation's distribution rights from Markstein Beverage Co. in San Marcos; Triangle Beverage in Santa Fe Springs; Ace Beverage in Los Angeles; and Beauchamp Distributing Company in Compton. Through these, Reyes acquired over an additional ten-million case equivalents. Constellation Brands accounted for an estimated 30-45% of each of the selling distributors.

137.    Upon information and belief, Reyes forced each of these California beer distributors to sell their Constellation Brands' distribution rights to Reyes under anticompetitive circumstances. On August 23, 2018, Reyes began investing in an enormous 355,000 square foot warehouse near Los Angeles. Weeks later, Constellation Brands notified these distributors that they were required to sell Constellation's distribution rights to Reyes because they wanted to work with a larger distributor.

138.    In announcing Reyes' acquisition of Constellation Brands' distribution rights from numerous distributors throughout Southern California, a Constellation spokesperson said: "As the industry evolves and increases complexity, we believe the distributor tier will continue to consolidate. . . . [T]he changes we've made to unify our route to market in SoCal are about best positioning us for long-term health and success of our business and the industry."

139.    In response, Craig Pursur, the President and CEO of the National Beer Wholesalers Association, said at the trade association's annual convention in San Diego that beer companies that terminate "highly performing distributors without cause" lead to "distrust and hurt the entire beer category."

140.    At the time, Triangle president Peter Heimark noted that Reyes had already started construction of its new warehouse within a half mile of Triangle's warehouse, weeks before Triangle was notified of the termination. He said at the time: "Whether or not Constellation guaranteed that [Reyes] would get the business, I guess that remains to be debated[.] But they were certainly notified by Constellation ahead of time that we would be terminated. I can't imagine they would have built a warehouse two blocks from me otherwise."

141.    Triangle Beverage survived for two years following Reyes' anticompetitive acquisition of its Constellation distribution rights. In or about October 2020, Triangle sold its remaining assets to ABI, and announced it was shuttering its doors.

142.    Ace Beverage also announced in October 2020 that ABI would be acquiring its assets in a deal set to close in December.

143.    Markstein hung on for just a year before selling its remaining assets to ABI and announcing it was going out-of-business in October 2019. At least 60 employees were adversely affected by Markstein's shutdown.

144.    Reyes' anticompetitive conduct ultimately drove at least three of these four well-established distributors out-of-business.[18] Brewers in these territories are now faced with even fewer distribution options than before.

### 4.    DBI Stopped Performing Under Its Agreement with Seismic to Pressure Seismic to Accede to Reyes' Form Contract

145.    Under each of the DBI/Seismic Agreements, DBI agreed to "use ***best efforts to develop and increase the sale*** of the Products throughout the Territory." (Exs. 1-5. at 4, ¶ 5(a)

---

[18] Beauchamp has survived thus far, but Beer Business Daily opined at the time that it could not "fathom why Beauchamp did not sell its entire business" to Reyes.

1  (emphasis added).)[19] DBI failed to use best efforts in the marketing, development, and sales of

2  Seismic's products throughout the relevant territories.

3      146.    ████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8      147.    ████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████

14      **J.     Reyes, Already America's Largest Beer Distributor, Completes Massive
        Acquisition of DBI**

15     148.    Upon information and belief, Reyes signaled its intent to acquire DBI and/or DBI's

16 current distribution agreements around the end of 2018.

17     149.    On or about June 12, 2019, DBI entered into a memorandum of understanding under

18 which Reyes would acquire substantially all of the assets and distribution agreements of DBI's

19 Northern California subsidiaries.

20     150.    On July 8, 2019, Reyes announced on its website that it had signed an agreement to

21 acquire DBI's Northern California business.

22     151.    On September 13, 2019, Reyes' acquisition of DBI and 28 million case equivalents

23 closed in a deal that industry observers estimated to be valued at $550 million.

24

25

26

27 ─────────────────────

28 [19] This is in marked contrast to Reyes' proposed agreement that DBI foisted on Seismic as a sham assignment – which only obligated Reyes to "to make a good-faith effort to grow Supplier's business in line with available market opportunities that exist within the Territory." (Ex. 6, § 6.1(a).)

152.     The DBI Defendants agreed to help Reyes further consolidate its monopoly power in California's beer distribution market, including by agreeing that Reyes could re-negotiate Seismic's distribution agreements that DBI purported to assign as part of the transaction.

153.     In DBI, Reyes acquired a massive collection of jigsaw pieces it was missing in Northern California, from Chico to San Jose. The DBI acquisition cemented Reyes' *Risk*-like take-over of entire territories of California's beer distribution market, from Chico south to San Diego.

       **1.     Seismic Responds Quickly to DBI's Delayed Notice of Its Sale to Reyes**

154.     Despite striking an agreement with Reyes in June, DBI waited nearly an entire month before notifying Seismic on July 8, 2019, of its intent to engage in an asset purchase transaction with Reyes. In DBI's July 8 letter, DBI requested Seismic consent to assigning the DBI Agreements to Reyes.

155.     As soon as DBI provided Seismic with notice of its intent to assign the agreements to Reyes, Seismic acted quickly, and with full disclosure to DBI, to obtain the information it needed to determine whether it would consent to the assignment, as is its right under Section 11(a)(ii) of the DBI Agreements.

156.     Between July and August of 2019, Seismic engaged with Reyes and held calls, emails and meetings to better understand DBI's proposed "assignment." These meetings included, in late July, Reyes visiting Seismic's premises on-site in Sonoma County, and conversely, on August 20, Seismic visiting Reyes' facilities on-site in Huntington Beach.

157.     Seismic learned in those meetings that Reyes had no interest in acquiring the existing DBI/Seismic Agreements. Instead, Reyes wanted Seismic to execute brand new agreements that would remove most of Seismic's material protections, and impose different and much less favorable terms.

       **2.     DBI and Reyes Insist on a Different Distribution Agreement in Breach of the Assignment Provision**

158.     On August 21, 2019, following Seismic's site visit, Reyes sent Seismic its boilerplate form distribution agreement, containing materially different and far less favorable terms than the original DBI Distribution Agreements. (**Exhibit 6**.)

159. ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████

160.    Seismic had secured many significant protective provisions in its Agreements with DBI that were completely absent from Reyes' anticompetitive form agreement.

161.    The Agreements required DBI to "use best efforts to develop and increase the sale of" Seismic's beer. (Exs. 1–5, ¶ 5(a).) Reyes' anticompetitive form agreement required it to use "commercially reasonable efforts to sell, promote, distribute, and merchandise" Seismic's beer. (Ex. 6, at 6, ¶ 6.2):

5.  Agreements by Distributor.

    (a)  Duty to Sell and Promote the Products.  Distributor agrees to use best efforts to develop and increase the sale of the Products throughout the Territory.

(DBI/Seismic Agreements, Exs. 1–5, ¶ 5(a).)

6.2  **Duty to Sell and Promote.**  Wholesaler reserves the unqualified right to manage its business in all respects; provided, that Wholesaler agrees to exert commercially reasonable efforts to sell, promote, distribute, and merchandise the Products to retailers in the Territory during the term of this Agreement.

(Reyes Form Agreement, Ex. 6, ¶ 6.2.)

162.    The Agreements gave Seismic quality control oversight (Exs. 1–5 at 4–5, ¶¶ 5(b), (e)); sales benchmarks/goals (*id.* at 5 & 14, ¶¶ 5(f) & 9(d)); control over an annual marketing and sales plan (*id.* at 10, ¶ 6(h)); the right to terminate the agreements without cause (*id.* at 13, ¶ 9(c)); an agreed break fee (*id.* at 14, ¶ 9(e)); and the right to reasonably withhold consent to DBI's unreasonable assignment (*id.* at 16, ¶ 11(a)(ii)).

163.    Conversely, Reyes' boilerplate form agreement offered Seismic none of these significant protections. (*See* Ex. 6 at 1–14.) Reyes refused to honor Seismic's preexisting Agreements that DBI was attempting to assign to the extent they provided Seismic with significant rights like quality control oversight; sales benchmarks/goals; control over an annual marketing and

1  sales plan (the burden of which Reyes attempted to shift onto Seismic) (*see id.*, at 5, ¶ 6.1(a)); the

2  right to terminate the agreements without cause; an agreed break fee; and the right to reasonably

3  withhold consent to Reyes' unreasonable assignment.

4        164.    These material changes to the contract, foisted by DBI through its purported

5  "assignment," breached the assignment provision of the DBI/Seismic Agreements. They also

6  would have rendered Seismic vulnerable and in a potentially inescapable relationship with a mass-

7  market, global beer distribution entity that in many ways opposed everything that Seismic stands

8  for as an eco-friendly, environmentally sustainable micro-craft brewery offering high-quality beer.

9               **3.**    **Reyes Does Not Provide Information Requested by Seismic, and Seismic Terminates**

10

11        165.    On August 23, 2019, Seismic emailed Reyes requesting additional information

about the identity of Reyes' point person for logistics and planning, and Reyes' proposed

12  marketing and sales process for the Seismic brand.

13        166.    Three days later, Reyes replied: "I will have others in our organization circle back

14  with you on your other questions." No one from Reyes provided the requested information.

15        167.    Reyes' failure to provide such information materially impaired Seismic's ability to

16  evaluate Reyes' qualifications to perform under the "best efforts" standard required under the

17  DBI/Seismic Agreements.

18        168.    Seismic then learned from Markstein Beverage Co. that DBI had requested it to pay

19  a 3x multiple of last year's gross profits on the sale of Seismic's beers as purported compensation

20  to DBI for Seismic's distribution rights.

21        169.    On September 12, 2019, Seismic informed DBI that it could not consent to the

22  requested "assignment" of the DBI Agreements, which, in part, would have utterly changed the

23  nature of Seismic's rights and obligations to Seismic's considerable detriment, and thus gave notice

24  of termination.

25        170.    DBI thereafter delayed in transitioning Seismic's beer to Markstein, which hurt

26  Seismic's sales in one or more of DBI's exclusive distribution territories under the Agreements.

27  **K.**    **Reyes Acquires Elyxir, Further Consolidating Reyes' Hold of California's Beer Distribution Market**

28

COMPLAINT

171.    Less than a year later, Reyes engaged in a carbon copy of its anticompetitive misconduct in acquiring co-conspirator Elyxir.

172.    On June 16, 2020, Reyes announced on its website that it had entered into an agreement to acquire substantially all of the assets of co-conspirator Elyxir in the Monterey Bay Area of California, including Santa Cruz, Monterey, and San Benito.

173.    On June 19, 2020, co-conspirator Elyxir notified Seismic that it had entered into an agreement to sell all of its assets, including all distribution rights, to Reyes.

174.    In the June 19 letter, co-conspirator Elyxir wrote that the agreement provided for Elyxir's distribution rights, inventory, and related items to be transferred to Reyes at the closing targeted for August 21, 2020. Elyxir asked that Seismic indicate its agreement to this transfer of rights by signing and returning the letter to Elyxir.

175.    Seismic sent Reyes the Elyxir Agreement and asked for Reyes' redline and review. On July 28, Seismic wrote Reyes that it was happy to consider assignment, so long as Reyes' proposed distribution agreement had the same substantive supplier and distributor rights as the Elyxir Agreement.

176.    But as with the DBI acquisition and sham assignment, Reyes was not interested in being assigned the distribution rights held by co-conspirator Elyxir. Instead, it insisted on a different distribution agreement with materially different terms.

**1.     Elyxir and Reyes Insist on a Different Distribution Agreement in Breach of the Assignment Provision**

177.    On August 4, 2020, Reyes demanded materially different and far less favorable terms than the original Elyxir Agreement.

178.    Contrary to co-conspirator Elyxir's request for consent to assign Reyes "Elyxir's distribution rights," Elyxir actually sought to fundamentally change those distribution rights and assign them without Seismic's consent. Elyxir's attempted assignment would have fundamentally and materially changed Seismic's relationship with its distributors, eliminating significant protections Seismic obtained after arms-length bargaining.

179.    Seismic had secured many significant protective provisions in the Elyxir Agreement, which were completely absent from Reyes' counterproposal.

180.    The Elyxir Agreement required Elyxir to "use best efforts to develop and increase the sale of" Seismic's beer. Reyes' counter was that "best efforts" is "not industry standard," and that this would need to be changed to "commercially reasonable efforts."

181.    The Elyxir Agreement gave Seismic quality control oversight; sales benchmarks/goals; refrigerated delivery; control over an annual marketing and sales plan; the right to terminate the Agreement without cause; the right to terminate the Agreement without payment for a failure to perform; an agreed break fee; and the right to reasonably withhold consent to Elyxir's unreasonable assignment.

182.    Conversely, Reyes' counter offered Seismic none of these significant protections. Reyes refused to honor Seismic's preexisting Elyxir Agreement that co-conspirator Elyxir was attempting to assign to the extent it provided Seismic with significant rights like "best efforts", refrigerated delivery, and sales benchmarks/goals.

183.    These material changes to the contract, foisted by co-conspirator Elyxir through its purported "assignment," breached the assignment provision of the Elyxir Agreement. They also would have rendered Seismic vulnerable and in a potentially inescapable relationship with a mass-market, global beer distribution entity that in many ways opposed everything that Seismic stands for as an eco-friendly, environmentally sustainable micro-craft brewery offering high-quality beer.

184.    Accordingly, on August 12, 2020, Seismic notified co-conspirator Elyxir that it was withholding its consent to Elyxir's proposed transfer of Seismic's distribution rights to Reyes. Seismic followed up with a detailed letter explaining that Elyxir could not assign rights that it does not have because Reyes was refusing to agree to the same material terms in the Elyxir Agreement.

185.    On August 21, 2020, Reyes closed its acquisition of co-conspirator Elyxir and its 2.5 million case equivalents of annual distribution.

186.    Co-conspirator Elyxir agreed to help Reyes further consolidate its monopoly power in California's beer distribution market, including by agreeing that Reyes could re-negotiate Seismic's distribution agreements that Elyxir purported to assign as part of the transaction.

**L.     DBI's Destruction of Evidence and Efforts to Cover Up the Conspiracy**

187.     During the course of discovery in an action proceeding in California state court, Seismic deposed DBI's person most qualified regarding its evidence preservation. That deposition revealed that DBI failed to preserve significant sources of evidence, including computers and cell phones issued to its litigation hold recipients.

188.     At the deposition of DBI's person most knowledgeable, its former CEO, Mr. Ramer, admitted that DBI and/or Reyes permanently destroyed significant amounts of evidence, including all information on any cell phones and most of the computers used by those who received a litigation hold from DBI. All documents on DBI's custodians' laptops—from witnesses who were important enough to be made recipients of DBI's litigation hold—are gone forever.

189.     Seventeen people received DBI's litigation hold: DBI's General Counsel, who prepared the advisory, and 16 employees. But DBI imaged only *seven* of those 17 laptops. The rest of the laptops are lost forever.[20]

190.     Mr. Ramer testified that DBI never issued a litigation hold to Reyes and that DBI's General Counsel apparently tried but could not convince Reyes to return or preserve DBI's laptops. Instead, Reyes sent at least eight of the DBI laptops to be permanently destroyed.[21]

191.     Similarly, DBI did not issue a litigation hold to any of its agents who advised or otherwise worked on the Reyes transaction.[22]

192.     At least nine DBI employees were never issued litigation holds despite working at DBI for the entire duration of Seismic's distribution relationship. Consequently, all their evidence and documents were lost and undiscoverable.[23]

193.     DBI did not preserve roughly 1,300 mobile devices that it had issued to its employees. Those devices are no longer accessible.[24]

---

[20] Jan. 29, 2021 Deposition of Person Most Qualified of DBI Beverage, Inc., Mark Ramer ("DBI Dep.") at 48:9-22.
[21] *Id.* at 55:14-22, 58:21-59:1, 81:19-21.
[22] *Id.* at 204:3-9.
[23] *See id.* at 135:9-157:3.
[24] *Id.* at 227:16-19.

194.    In addition, despite being designated the person most knowledgeable, Mr. Ramer was not aware of any steps taken to preserve the data room from the acquisition or why no litigation hold was issued to the vendor that hosted it.[25]

195.    Mr. Ramer confirmed he was not instructed to preserve the categories of documents Seismic instructed DBI to preserve in March 2020 (relating to "(a) the Reyes acquisition; (b) Seismic; (c) the beer market in California; (d) DBI's or Reyes's market share for distribution of beer in California; and/or (e) the actual and potential claims, defenses and allegations in this litigation."[26]

196.    DBI intentionally did not automatically backup employee laptops to company file servers. Setting aside the seven imaged laptops, if anything on another laptop was not affirmatively copied to the cloud, it is lost forever.[27]

197.    As a result of DBI's conduct, large swathes of relevant evidence have been destroyed and are unrecoverable. On information and belief, DBI destroyed this evidence to conceal its conspiracy with Reyes.

**M.    Defendants' Conduct Has Harmed Seismic and Competition in the Relevant Market**

198.    Seismic is proud to count itself among the more than one thousand craft brewers who call California home, and is proud to be the one asking the Court to enforce the antitrust laws against Co-Defendants to restore competition to California's beer distribution market. Although this problem affects an incredible number of craft brewers throughout the state, no current customers of Reyes can step forward, or they would face economic retaliation and blackballing.

199.    As a result of Defendants' conduct, Reyes now has monopoly power in California's beer distribution market, and is using that monopoly power in anticompetitive ways.

200.    Reyes has implemented a plan to acquire distributors in key geographic markets so it can control what beers are distributed in those markets. But Reyes' problematic competitive conduct goes well beyond acquisitions of independent distributors.

---

[25] *Id.* at 157:16-162:17.
[26] *Id.* at 199:16-201:19.
[27] *See id.* at 215:13-23.

201.    Rather than compete fairly with well-established distributors, Reyes is using its dominance of a highly concentrated market to compete illegally, and to harm the California beer distribution market, craft brewers and consumer choice.

202.    In a properly functioning market, distributors like Reyes would be competing for every case equivalent their trucks could carry. But because Reyes is a monopolist, it instead employs a "pay-to-play" incentive system in which brewers are required to pay to have Reyes' sales representatives place their beer with retail accounts. When craft brewers do not participate, Reyes removes their preexisting placements and does not give consumers the beers they desire. In particular, Reyes employs the incentive system to benefit Constellation Brands at the expense of its craft brewers. Thus, Reyes' exercise of its anticompetitive market power removes choice and increases prices for California consumers.

203.    Reyes also uses its monopoly power to further entrench its monopoly by forcing beer manufacturers to agree to contracts that do not permit the brewer to switch distributors absent highly unlikely for-cause reasons, such as Reyes' losing its license to distribute beer or Reyes' executives being convicted of crimes. If brewers refuse to execute such contracts—as Seismic did here—Reyes conspires with and enlists the selling distributors (here, DBI and Elyxir) to pressure and punish the brewer until they relent or go out of business.

204.    Defendants' conduct has caused injury to both Seismic and the relevant market. Reyes' monopolization of the distribution market has allowed it to forego competing for business by offering competitive service terms. This dynamic is evidenced by similar issues on the retailer side of the market. In June of 2021, the SF Bar Owner's Alliance (a group of 471 San Francisco bars) sent an open letter to Golden Brands—Harbor's d/b/a for the acquired DBI entities— complaining about unprecedented reductions of service, including refusals to provide accounts to sales representatives and refusal to deliver product more than once a month. This letter is appended hereto as **Exhibit 7**.

205.    At the same time, Reyes' monopolization of the market has eliminated potential competition in the form of other distributors for Seismic's beers. Where Seismic was once on an exponential trajectory of upward growth in DBI sales territories, its sales are now less than half the

1  level Seismic attained prior to the DBI transition. The loss of Seismic's sales position in former

2  DBI markets alone is an injury in the millions of dollars and will have long-term negative effects

3  on Seismic's growth trajectory, goodwill, market share, and competitive position against other craft

4  brewers.

5      206.    Even where Seismic has been able to find new distributors to cover former DBI and

6  Elyxir distribution territories, Seismic has suffered substantial antitrust injuries resulting from the

7  consolidation of the market by Reyes. Seismic has incurred significant costs scrambling to replace

8  the bespoke distribution agreements it had negotiated—often on less favorable terms than those it

9  had negotiated at arm's length prior to Reyes' unlawful concentration of the market. Those new

10  distributors are also hampered in their ability to promote and place Seismic's products by limited

11  access to shelf space in the face of the power Reyes can exert on retailers to advance favored

12  brands.

13     207.    Seismic and other market participants have also suffered increased distribution costs

14  as a result of Reyes' monopolization of the market. In many instances, Seismic has been forced to

15  self-distribute, a project in which it lacks expertise and economies of scale. And where Seismic has

16  secured new distributors, it has been forced to utilize distributors within the ABI network, with all

17  of the perils that holds for craft brewers (as recognized in the US Treasury's recent report on

18  competition issues in the alcohol market). The increase in costs and reduction in prices paid

19  undermines Seismic's ability to compete and results in significant additional long-term injury.

20     208.    As a direct result of Defendants' conduct, Seismic is losing sales, goodwill, market

21  share and the freedom to contract for beer distribution throughout California.

22                          **CAUSES OF ACTION**

23                       **FIRST CAUSE OF ACTION**
                     **Conspiracy to Monopolize in**
24                **Violation of Section 2 of the Sherman Act**
                        (Against All Defendants)
25
26     209.    Seismic repeats and realleges the allegations of the Paragraphs above as if fully set

27  forth herein.

28

210.     Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

211.     Section 2 establishes three offenses, commonly termed "monopolization," "attempted monopolization," and "conspiracy to monopolize."

212.     Defendant Reyes, as alleged herein, has monopoly power, or at minimum, a dangerous probability of success in acquiring monopoly power, in California's beer distribution market.

213.     Defendant Reyes willfully and intentionally engaged in anticompetitive conduct to unlawfully maintain a monopoly in that market in violation of the Sherman Act.

214.     Beginning at least in or around the summer of 2019, Defendants Reyes, Harbor, DBI, and their co-conspirator Elyxir entered into and engaged in continuing unlawful agreements for the purpose of further monopolizing the market for beer distribution in California, including but not limited to agreeing to retaliate against suppliers who refused to consent to the anticompetitive transfer of DBI and Elyxir's market share to Reyes.

215.     Defendants Reyes, Harbor, DBI, and their co-conspirator Elyxir have or conspired to monopolize the beer distribution market in California. By engaging in the conduct above, Defendants are willfully maintaining and abusing a monopoly; leveraging their monopoly to control distribution and prevent other market participants, including Seismic, from acquiring competitive distribution agreements.

216.     Defendants' willful conduct as described above has given the Reyes/Harbor enterprise the ability to control and exclude competition.

217.     Defendants' ongoing anticompetitive conduct as described above presents a dangerous probability that Defendants Reyes/Harbor will succeed, to the extent they have not already, in their attempt to monopolize the relevant market, and will succeed in accomplishing their unlawful purpose of obtaining monopoly power.

218.     Defendants' conduct described above has caused Seismic antitrust injury, including but not limited to reduced sales, reduced revenues and profits, increased costs, loss of access to

markets and channels for distribution, inferior contract terms, loss of market position, lost goodwill, and loss of the ability to freely contract for beer distribution throughout California.

219.    Defendants Reyes, Harbor, and DBI knowingly and intentionally conspired with each other and their co-conspirator Elyxir with the specific intent to consolidate Reyes' monopoly power and for the purposes of destroying fair competition.

220.    In furtherance of Defendants' and Elyxir's conspiracy, they collectively agreed as part of Reyes' acquisitions to force Seismic and other craft brewers to negotiate new, anticompetitive distribution agreements upon DBI's and co-conspirator Elyxir's purported sham assignments of Seismic's distribution rights.

221.    There are effective barriers to entry into California's beer distribution market.

222.    Defendants' and Elyxir's conspiracy violates the Sherman Act.

223.    Defendants' conduct described above has caused Seismic antitrust injury, including but not limited to reduced sales, reduced revenues and profits, increased costs, loss of access to markets and channels for distribution, inferior contract terms, loss of market position, lost goodwill, and loss of the ability to freely contract for beer distribution throughout California.

224.    Seismic has suffered an antitrust injury as a direct and proximate result of the conspiracy between Defendants and their co-conspirators, and Defendants are therefore liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial.

**SECOND CAUSE OF ACTION**
**Monopolization and Attempted Monopolization in**
**Violation of Section 2 of the Sherman Act**
(Against Reyes and Harbor)

225.    Seismic repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

226.    Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States.

227.    Section 2 establishes three offenses, commonly termed "monopolization," "attempted monopolization," and "conspiracy to monopolize."

228. Defendant Reyes, through its wholly owned subsidiary Harbor, has monopoly power, or at minimum, a dangerous probability of success in acquiring monopoly power, in California's beer distribution market.

229. Defendant Reyes willfully and intentionally engaged in anticompetitive conduct to unlawfully achieve and/or maintain a monopoly in that market in violation of the Sherman Act.

230. Defendants' willful conduct as described above has given the Reyes/Harbor enterprise the ability to control and exclude competition.

231. Defendants' ongoing anticompetitive conduct as described above presents a dangerous probability that Defendants Reyes/Harbor will succeed, to the extent they have not already, in their attempt to monopolize the relevant market, and will succeed in accomplishing their unlawful purpose of obtaining monopoly power.

232. Defendants' conduct described above has caused Seismic antitrust injury, including but not limited to reduced sales, reduced revenues and profits, increased costs, loss of access to markets and channels for distribution, inferior contract terms, loss of market position, lost goodwill, and loss of the ability to freely contract for beer distribution throughout California.

233. There are effective barriers to entry into California's beer distribution market.

234. Defendants' conduct described above has caused Seismic antitrust injury, including but not limited to reduced sales, reduced revenues and profits, increased costs, loss of access to markets and channels for distribution, inferior contract terms, loss of market position, lost goodwill, and loss of the ability to freely contract for beer distribution throughout California.

235. Seismic has suffered an antitrust injury as a direct and proximate result of the Reyes/Harbor enterprise's actual and/or attempted monopolization. These Defendants are therefore liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial.

### THIRD CAUSE OF ACTION
**Violation of Section 7 of the Clayton Act**
(Against All Defendants)

236. Seismic repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

237. Section 7 of the Clayton Act provides that "no corporation engaged in commerce shall acquire . . . the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

238. The transactions in listed in Paragraph 121, through which Reyes acquired substantially all of the assets in California of DBI and numerous other distributors, and after which many of those distributors withdrew from the market entirely, substantially lessened competition in California's beer distribution market in violation of Section 7 the Clayton Act.

239. Reyes' and Harbor's conduct described above has caused Seismic antitrust injury, including but not limited to reduced sales, reduced revenues and profits, increased costs, loss of access to markets and channels for distribution, inferior contract terms, loss of market position, lost goodwill, and loss of the ability to freely contract for beer distribution throughout California.

240. As a result of Defendants' actions in violation of 15 U.S.C. § 18, Reyes is required to divest its equity, ownership stake, and all other tangible and intangible assets of DBI and Elyxir.

241. Seismic has suffered an antitrust injury as a direct and proximate result of the Reyes/Harbor enterprise's violation of Section 7. These Defendants are therefore liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial.

**FOURTH CAUSE OF ACTION**
**Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* (Unfair Competition)**
(Against All Defendants)

242. Seismic repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

243. As set forth above, Defendants' actions violated the Sherman Act and Clayton Act. Such unlawful acts are actionable under Section 17200. *See Cel Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) ("[T]he word "unfair" in [Section 17200] means conduct that threatens an incipient violation of an antitrust law."); *see also California v. Valero Energy Corp.*, No. C 17-03786 WHA, 2017 WL 4122830, at *5 (N.D. Cal. Sept. 17, 2017) ("[T]he analysis under Section 17200 proceeds along the same lines as the analysis under the Clayton Act."); *In re Apple iPod iTunes Anti-Tr. Litig.*, No. C 05-00037 JW, 2010 WL 2629907, at

*5 (N.D. Cal. June 29, 2010) ("Defendant moves to dismiss Plaintiffs' UCL claim on the ground that it is premised on Plaintiffs' Section 2 claim. In light of the Court's finding that Plaintiffs have adequately stated a Section 2 claim, Plaintiffs have also adequately stated a UCL claim under the 'unlawfulness' prong."); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003) ("Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices.") (holding that violations under federal Foreign Corrupt Practices Act are actionable under UCL).

244.    As a result of Defendants' unfair, unlawful, and fraudulent competition, Seismic has lost money and customers, and continues to do so.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Seismic Brewing Company prays that this Court enter judgment against Defendants and in favor of Plaintiff as follows:

A.    Divestiture of Defendants' unlawful acquisitions, including without limitation an order requiring Reyes to divest itself of DBI, Elyxir, and its other recent acquisitions which have unlawfully concentrated the beer distribution market.

B.    Injunctive relief, including without limitation an order prohibiting Defendants from (i) retaliating against Seismic in California or other markets; (ii) disparaging Seismic; and (iii) disregarding Seismic's existing contractual terms and conditions in the event that any Defendant acquires a distributor with whom Seismic has a distribution agreement in the future.

C.    Compensatory damages.

D.    Treble damages.

E.    Attorneys' fees and costs.

F.    Interest.

G.    All such further relief as the Court deems just and proper.

1

2    Dated:  April 12, 2022                          Respectfully Submitted,

3                                                    BRAUNHAGEY & BORDEN LLP

4
                                                     By:  ___/s/ J. Noah Hagey_____
5                                                             J. Noah Hagey

6                                                    *Attorneys for Plaintiff*
7                                                    *WSJ, LLC d/b/a SEISMIC BREWING CO.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
## <u>JURY DEMAND</u>

2       Plaintiff Seismic Brewing Company hereby demands a trial by jury on all causes of action

3 and claims so triable.

4

5 Dated:  April 12, 2022              Respectfully Submitted,

6                                BRAUNHAGEY & BORDEN LLP

7                            By:  */s/ J. Noah Hagey*

8                                  J. Noah Hagey

9                           *Attorneys for Plaintiff*

10                          *WSJ, LLC d/b/a SEISMIC BREWING CO.*

48
COMPLAINT